# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

ANZIO IRONWORKS, CORP.,

      Petitioner,

v.                                      Case No: 8:20-cv-2132-KKM-AAS

AARON R. GERBER as Director
of Industry Operations at the Bureau
of Alcohol, Tobacco, Firearms &
Explosives,

      Respondent.

_____

## ORDER

Anzio Ironworks, Corp., seeks judicial review of the Bureau of Alcohol, Tobacco, Firearms & Explosives's (ATF) decisions to revoke its Type 10 federal firearms license (FFL) and deny its application for a Type 07 license. Following submission of the administrative record, both parties request summary judgment. The Court concludes that Anzio willfully violated federal firearms regulations and thus ATF was authorized to revoke Anzio's existing license and deny its license application.

## I.   BACKGROUND[1]

Federal law prohibits making or selling firearms and related products such as

ammunition and silencers. *See* 18 U.S.C. §§ 922(a), 923(a). The Gun Control Act of 1968

(GCA) provides an exception for entities to whom the Attorney General issues a license.

*See* § 923(a). The Attorney General delegated the task of licensing to ATF.

License holders are subject to extensive legal obligations. The GCA tasks the

Attorney General (and by delegation ATF) with ensuring that licensees do not abuse their

privileges to make and distribute deadly merchandise by willfully violating the gun laws

and regulations. ATF conducts periodic compliance inspections at the premises of

licensees. And ATF may, after notice and opportunity for a hearing, "revoke any license"

if the licensee "willfully violated any provision of [the GCA] or any rule or regulation."

§ 923(e).

Michael Remo is "self-taught gunsmith" who founded Anzio Ironworks, Corp.,

"many years ago," and remains its president. (Doc. 44 at 3.) Anzio "primarily manufactures

handmade, high caliber firearms and ammunition." (*Id.*) For example, it makes and sells

20mm rifles, 14.5mm rifles, and the silencers and suppressors for these weapons. (Doc. 37-

1 at 3.) It is allowed to do so because it possesses a Type 10 FFL, (Doc. 25-2 at 11), which

permits it to manufacture destructive devices, ammunition for destructive devices, and

---

[1] To the extent facts are disputed or capable of multiple inferences, the Court construes the record in the nonmovant's favor. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1262 (11th Cir. 2020).

armor piercing ammunition, (Doc. 44 at 3), at its premises located in Clearwater, Florida, (Doc. 37-1 at 2). Anzio has held the license since 2006. (*Id.* at 4.) From 2012 to 2017, Anzio also held a Type 07 FFL license, which allows for manufacturing of firearms, but not destructive devices. (Doc. 25-2 at 48, 68)

Because Anzio is a corporation, it can only act through its agents. For corporations with FFLs, the individuals permitted to act for the licensee are known as "responsible persons." (Doc. 25-13 at 5; Doc. 25-2 at 17.) Anzio's responsible persons included Remo, and Marcos Ruiz. (Doc. 37-1 at 4; Doc. 24-2 at 18.) In addition to his role at Anzio, Ruiz was the sole responsible person for Ligamec Corporation, which holds a Type 07 FFL for a location in Odessa, Florida. (Doc. 37-1 at 4; Doc. 25-14 at 6.)

### A. Anzio's 2012 Violations

ATF investigators inspected Anzio's premises and records in February 2012. The investigators cited Anzio for numerous violations under six separate regulatory sections. (Doc. 37-1 at 5–6; Doc. 25-11 at 3.) Two are particularly relevant here. First, ATF found that Anzio violated 27 C.F.R. § 478.124(a), which imposes recordkeeping requirements on licensed manufacturers and dealers who sell or dispose of a firearm. Second, Anzio violated 27 C.F.R. § 478.50 by operating at a location other than the one listed on its license. (Doc. 25-2 at 43–44, 46–47.) Specifically, Anzio operated a machine shop at a second location that was not licensed for firearms manufacturing. (Doc. 44 at 9; Doc. 25-

3

2 at 47, 71–72.) The investigators "discussed [the violations] with [Remo] during the inspection." (Doc. 25-11 at 1.)

Following the inspection, ATF sent Anzio a letter on May 8, 2012, announcing that Remo must attend a warning conference to address the violations. (*Id.* at 1; Doc. 25-2 at 44.) The letter also informed Anzio that it would inspect the premises again and that future violations could result in revocation of its license. (Doc. 25-11 at 1.) Given the connection between firearms regulations and public safety, the letter informed Anzio that it was "essential that [it] comply with all federal laws and regulations that govern [its] firearms business." (*Id.* at 1.)

On May 30, 2012, Remo attended a warning conference on Anzio's behalf to discuss "the violations found," (*id.* at 1), including § 478.50's prohibition on operating from a location other than that listed on the FFL, (Doc. 25-2 at 44). "The agenda for the meeting [was to] include a discussion of the reasons for the violations, a review of the legal requirements, and a discussion of steps to be taken by [Anzio] to ensure future compliance." (Doc. 25-11 at 1; Doc. 25-2 at 44.) Although Remo testified later that the conference did not address whether responsible persons could manufacture at a second location, (Doc. 25-2 at 72), ATF personnel also told Remo "again of the limitations of manufacturing." (*Id.* at 47.)

On June 5, 2012, ATF sent Anzio a follow-up letter summarizing the warning conference. (Doc. 25-11 at 3.) The letter listed the regulations that Anzio violated, including § 478.50. (*Id.*) It reported that ATF agents at the conference gave Remo a "thorough review of the regulatory requirements." (*Id.*) And it recounted Remo's statement "that [Anzio] would only operate from licensed premises" and that it "now understand[s] these requirements fully and will remain in compliance with them." (*Id.*) Finally, the letter stressed the importance of abiding by the FFL regulations. It reminded Anzio that failure to comply "could adversely impact law enforcement's ability to reduce violent crime and protect the public." (*Id.*) It also told Anzio to "anticipate further inspections to ensure [its] compliance" and "reminded [Anzio] that future violations, repeat or otherwise, could be viewed as willful and may result in the revocation of [its] license." (*Id.*)

### B. Anzio's 2018 Violations

Six years after those violations and warnings, in September 2018, ATF again inspected Anzio's premises and records. (Doc. 25-3 at 1.) ATF investigators Salina Lapella and Jon-Wayne Griffin conducted "an unannounced compliance inspection." (Doc. 25-2 at 18–19.) They inspected Anzio's inventory and records for the prior year—September 26, 2017, through September 25, 2018—and found numerous violations. (*Id.* at 19; Doc. 37-1 at 2.)

5

Of the violations in 2018, two break the same regulations Anzio violated in 2012. (Doc. 25-2 at 43, 46.) The first is 27 C.F.R. § 478.124(a), which deals with maintaining records on the disposition of firearms. ATF found that Anzio failed to properly record the disposition of more than 70 firearms during the previous year. (Doc. 25-13 at 6–7.)

The second repeat violation was of § 478.50, which prohibits operating from unlicensed premises. Immediately upon arrival for the 2018 inspection, Lapella suspected that Anzio was manufacturing and assembling at a second location because the facility looked too small for manufacturing and did not have "any manufacture type machinery." (Doc. 25-2 at 40; Doc. 37-1 at 3.) In response to questions, Remo admitted to the agents "that there was some assembly of firearms going on at a different location," (Doc. 25-13 at 7), and he mentioned that Anzio might apply for "an alternative licensed location . . . in order to have more room to manufacture" in the future, (Doc. 37-1 at 3).

The ATF investigators later learned that Anzio's practice was to give the destructive devices or suppressors to Ruiz, who would take it to Ligamec Corp.'s location in Odessa, Florida, for manufacturing and assembly. (Doc. 25-2 at 41, 48.) Once they were finished, Ruiz would return them to Anzio's premises in Clearwater, Florida. Anzio had processed forty-five firearms in this manner, consisting of forty-three destructive devices and two silencers. (Doc. 25-13 at 9.)

There were three problems with this approach. First, it violated Anzio's license by performing activities at a location other than that listed on its license. *See* § 478.50 (explaining that a "separate license must be obtained for each location at which a firearms or ammunition business or activity requiring a license under this part is conducted"). Second, it violated Ligamec's license. Ligamec held a Type 07 license, which did not allow for manufacture of destructive devices. (Doc. 25-2 at 48–49.) Third, it violated the rules on acquisition and disposition of firearms, because—at Remo's direction— neither Anzio nor Ligamec recorded the transfers in their logbooks. (*Id.* at 50–51, 54.)

Following Anzio's inspection, ATF searched the inventory and records at Ligamec. (*Id.* at 47–58.) During that inspection, Ruiz confirmed to ATF that "he was doing assembly for Anzio Ironworks on site [at] his business premises" and that, given the limitations of a Type 07 license, he "knew he wasn't supposed to have [the transferred firearms and suppressors]." (*Id.* at 48.) At the conclusion of Ligamec Corp.'s inspection, Ruiz surrendered his license and withdrew as a responsible person for Anzio. (*Id.* at 51.)

Based on the findings from the September 2018 inspection, ATF determined that Anzio willfully violated federal statutory and regulatory requirements. (Doc. 25-3 at 1, 5.) On December 26, 2019, ATF issued two notices to Anzio. One informed Anzio that ATF was revoking its existing Type 10 license. (Doc. 25-3 at 1.) The other informed Anzio that

ATF was denying the application for a Type 07 FFL that it had filed in April 2019. (Doc. 25-4; Doc. 25-2 at 11.)

Following the notices, Anzio requested an administrative hearing. The hearing was held on March 11, 2020. (Doc. 25-5 at 1.) Aaron Gerber, the Director of Industry Operations for ATF's Tampa division, presided. ATF agents presented evidence and testimony to support the violations. Remo, appearing on behalf of Anzio, argued that the denial and revocation were improper because the violations—which he admitted—were not willful. (Doc. 25-13 at 10; Doc. 25-2 at 62–63.) As he had explained at the inspection, Remo testified that he believed that a responsible person could manufacture firearms at any licensed location. (Doc. 25-2 at 54, 76.)

Based on a review of the evidence and testimony at the hearing, Director Gerber determined that Anzio willfully violated the GCA and its implementing regulations because Anzio "knew and understood [its] obligations . . . but purposefully disregarded or was plainly indifferent to these known legal obligations." (Doc. 25-13 at 11.) Specifically, Gerber found that Anzio willfully transferred firearms without completing ATF forms, did not keep accurate records for the acquisition and disposition of firearms, manufactured outside of its business premises, and aided and abetted Ligamec in not properly recording its acquisition and disposition of firearms. (*Id.* at 6–10.) Accordingly, Gerber revoked

8

Anzio's Type 10 FFL and denied its application for a Type 07 FFL. (*Id.* at 11; Doc. 25-14 at 11.)

Following the final revocation and denial of the licenses, Anzio sought judicial review in this Court. (Doc. 1.) ATF stayed the revocation of Anzio's license pending resolution of this case.

## II.   LEGAL STANDARD

When the ATF decides to deny a license application or revoke an existing license, the GCA provides that the "aggrieved party" may file a petition in federal district court "for a de novo judicial review of such denial or revocation." 18 U.S.C. § 923(f)(3). The reviewing court may consider the administrative record and any additional evidence the parties submit. *Id.* The court's review is limited to deciding whether ATF was "authorized to deny the application or revoke the license." *Id.* If it was not, the court must order the decision be reversed. *Id.* Summary judgment is appropriate if "there is no genuine issue as to any material fact" on whether the decision was authorized. *Willingham Sports, Inc. v. ATF* (*Willingham Sports II*), 415 F.3d 1274, 1276 (11th Cir. 2005) (per curiam) (quotation omitted); *see also* Fed. R. Civ. P. 56(a). In making that determination, the Court draws "all reasonable inferences in the light most favorable to the non-moving party." *Willingham Sports II*, 415 F.3d at 1276 (quotation omitted). However, a

nonmovant cannot defeat summary judgment with merely a scintilla of evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III.   ANALYSIS

The GCA authorizes ATF to revoke an FFL or deny an application for an FFL if a licensee or applicant willfully violates the GCA or its attendant regulations. *See* 18 U.S.C. § 923(e). Anzio and ATF agree that Anzio committed the violations cited in the revocation and denial documents. (Doc. 37 at 1–2; Doc. 44 at 2, 7.) The sole issue is whether Anzio's violations of the firearms regulations were willful.

For purposes of § 923, "willfulness" requires "a showing of purposeful disregard of or plain indifference to the laws and regulations imposed on firearms dealers." *Willingham Sports II*, 415 F.3d at 1277. A "bad purpose or evil motive is not required." *Id.* at 1276. Instead, a "licensee's violations are willful if they occur 'after [it] has been informed of the regulations [or] warned of violations.'" *See Wilborn v. ATF*, No. 5:14-cv-00991, 2014 WL 5502495, at *3 (N.D. Ala. Oct. 30, 2014) (quoting *Willingham Sports II*, 415 F.3d at 1277). In determining willfulness, courts consider: "(1) prior knowledge of the [relevant] obligations, (2) repeated failure 'to comply with . . . the same or similar' regulations, and (3) receipt of a warning letter 'advising [the licensee] that repeated violations of the regulations could result in revocation of its license.'" *Id.* (second alteration in original) (quoting *Willingham Sports II*, 415 F.3d at 1277).

10

A single willful violation authorizes ATF to revoke or deny an FFL. *See Pinion Enters., Inc. v. Ashcroft*, 371 F. Supp. 2d 1311, 1317 (N.D. Ala. 2005). Accordingly, if even one of Anzio's violations were willful, ATF was authorized to revoke its license and deny its application and thus this Court should grant summary judgment to ATF.

It is undisputed that Anzio gave destructive devices to Ruiz, one of its responsible persons, for manufacturing and assembly at Ligamec Corp., a location that was not listed as Anzio's business premises on its FFL. While Anzio acknowledges that off-site manufacturing is unlawful, it argues that the rule is unclear as it pertains to responsible persons and that it did not deliberately disregard it. The Court disagrees on both points. Because the Court agrees with ATF that Anzio willfully violated the premises requirement, the Court does not address the other violations.

### A. Federal Law Clearly Prohibits Off-site Manufacturing

Federal law is clear that a licensee may operate only from its licensed premises. The regulations implementing the GCA make the point explicitly. Section 478.41(b) explains that a person intending to make or deal in firearms must obtain a license "for each business and each place at which the applicant is to do business." 27 C.F.R. § 478.41(b). Once issued, a license "entitle[s] the licensee . . . to engage in the business specified by the license, at the location described on the license, and for the period stated on the license." *Id.*

Section 478.50 explains further that a "separate license must be obtained for each location at which a firearms or ammunition business or activity requiring a license under this part is conducted." 27 C.F.R. § 478.50. That license must be "posted and kept available for inspection on the premises covered by the license." 18 U.S.C. § 923(h). While there are a few exceptions to the premises limitation, none of them apply to manufacturing at a second location. *See* § 478.50(a)–(d) (excluding activities at gun shows, storage at a separate warehouse, and weapons classified as "curios and relics"). Indeed, § 478.100, which is helpfully titled "[c]onduct of business away from licensed premises," further clarifies (and limits) the scope of these exceptions. § 478.100; *see also* § 478.11 (defining a "[b]usiness premises" as the "property on which the manufacturing or importing of firearms or ammunition or the dealing in firearms is or will be conducted"). Anzio has not argued that these exceptions applied or that it misapprehended their scope.

The regulations also provide that a separate licensee fee is "required for each business or collecting activity at each place of such business or activity." § 478.42(a) (listing the fee for each separate manufacturing location); *accord* 18 U.S.C. § 923(a) ("[A] separate fee [is] required for each place in which the applicant is to do business."). So too, the process for changing a licensee's operating location is clear. Section 478.52 explains that if a licensee wishes to change the address specified on the license in order to "remove their business or activity to a new location," it must file an application for an "Amended Federal Firearms

License." 27 C.F.R. § 478.52. Anzio did not attempt to pay an additional fee for its second location or apply for an amended license to change its primary location.

### B. Anzio Deliberately Disregarded or Was Plainly Indifferent to the Premises Limitation

Not only was the law clear, but Anzio knew of it, too. Its knowledge of the premises limitation is evident from Anzio's long tenure as a license holder, its nearly identical violation in the past, its receipt of a warning letter from ATF, and the knowledge of its responsible persons. In sum, Anzio's 2018 violations show deliberate disregard or plain indifference to the premises limitation.

#### 1. Anzio's Experience with Firearms Regulations

The "length of time an individual has been licensed" is "relevant to willfulness." *CEW Props., Inc. v. ATF*, 979 F.3d 1271, 1281 (10th Cir. 2020); *accord Pinion Enters.*, 371 F. Supp. 2d at 1317 (reasoning that a petitioner's "long history as a license holder" suggests knowledge of legal requirements). A short license period suggests that errors are due to inexperience; a long one suggests deliberate disregard or plain indifference to the law and regulations.

Anzio had extensive experience with the regulations that bind FFL holders. Remo—Anzio's founder and president—has operated Anzio as a firearms manufacturer and dealer since 2006. Anzio held a Type 10 FFL for the entire period between 2006 and the inspection in 2018. Anzio also held a Type 07 FFL for five years. Anzio's and Remo's

13

prolonged experience in the firearms field thus undermines any claim that either lacked understanding of the basic limitations on the FFL privilege. As explained above, the statute and regulations are clear that all activities must be performed at the licensed premises. Anzio's off-site manufacturing after its long experience with federal firearms regulations supports the conclusion that Anzio deliberately disregarded that limitation or was indifferent to it. *See Nationwide Jewelry & Pawn v. ATF*, 455 F. Supp. 2d 1379, 1385 (M.D. Ga. 2006) (considering a licensee's long tenure as evidence of willfulness); *3 Bridges, Inc. v. United States*, 216 F. Supp. 2d 655, 659 (E.D. Ky. 2002) ("Petitioner was aware of the law . . ., as he has been a dealer for 10 years . . . .").

## 2.  Anzio's Prior Knowledge of Its Legal Obligations

A licensee's violations are likely willful if they occur "after it has been informed of the regulations and warned of violations." *Willingham Sports II*, 415 F.3d at 1277. "In other words, because a prior citation is a factor evidencing that a licensee possessed knowledge of his obligations, it follows that a violation occurring after the first citation is evidence that the licensee willfully disregarded those obligations." *Wilborn*, 2014 WL 5502495, at *4.

Anzio's violations of the premises limitation in 2018 "show purposeful disregard or plain indifference," *Willingham Sports II*, 415 F.3d at 1277, because they came after ATF cited Anzio for violating the same provision in 2012. Such a "repeat[] failure to comply

with regulations" is evidence of willfulness. *Pinion Enters.*, 371 F. Supp. 2d at 1317. That is particularly true when the acts underlying the violations are "the same or similar." *Willingham Sports II*, 415 F.3d at 1277. And here they are. In 2012, ATF cited Anzio for manufacturing firearms at a machine shop that was not its licensed premises. (Doc. 25-2 at 46–47, 71–72.) ATF told Anzio that this practice violated § 478.50 and that future violations may be deemed willful and result in revocation of its license. (Doc. 25-11 at 3.) This prior citation for off-site manufacturing gave Anzio "notice not only of [its] general obligations, but also of the specific provision[] that led to the ultimate revocation." *Franklin Gun Shop, Inc. v. Gonzales*, No. 3:05-cv-87, 2006 WL 2263992, at *7 (M.D. Ga. Aug. 8, 2006). Yet in 2018, Anzio manufactured firearms at a second location that was not its licensed premises, again violating § 478.50.

Following the 2012 violations, ATF ensured that Anzio was on notice of its obligations. It required Remo to attend a warning conference where ATF officials discussed the violations and the legal requirements. (Doc. 25-11 at 3.) At the meeting, ATF gave Anzio the "opportunity to comment on the violations and what specific actions [the] business ha[d] taken to ensure that the violations of 27 CFR 478.50 . . . will not reoccur." (*Id.*) After the meeting, Remo attested that he understood Anzio's obligations and that Anzio "would only operate from licensed premises." (*Id.*) Remo's attendance at the meeting on Anzio's behalf where ATF discussed the violations and how to avoid them

in the future is a "compelling" factor that Anzio's violations in 2018 were willful. *Pinion Enters.*, 371 F. Supp. 2d at 1317; *see Am. Arms Int'l v. Herbert*, 563 F.3d 78, 85 (4th Cir. 2009) (explaining that "where a licensee receives official warning that his actions violate the GCA and his record of compliance does not change . . . it is permissible to infer 'willfulness'").

ATF also sent a follow-up letter on June 5, 2012. It explained that Anzio and ATF had discussed § 478.50, (Doc. 25-11 at 3), which provides that that the license permits "the activity specified in the license at the address specified therein" and that a "separate license must be obtained for each location at which a firearms or ammunition business or activity requiring a license under this part is conducted," § 478.50. The follow-up letter also noted that Anzio "stated that [it] would only operate from licensed premises" and that it "now underst[oo]d these requirements fully and will remain in compliance with them." (Doc. 25-11 at 3.) Even aside from its experience and prior violations, this letter alone ensured that Anzio "knew that the firearms industry was heavily regulated, and that its ability to maintain its License hinged on its strict compliance with applicable rules and regulations," including § 478.50. *Willingham Sports, Inc. v. ATF* (*Willingham Sports I*), 348 F. Supp. 2d 1299, 1310 (S.D. Ala. 2004) (Steele, J.), *aff'd*, 415 F.3d 1274 (11th Cir. 2005).

Anzio's prior citation for violating § 478.50, the warning conference, and the follow-up letter "placed [Anzio] on notice of [its] obligations." *Wilborn*, 2014 WL 5502495, at *4. Indeed, the "primary significance of prior citations is the notice that they give to the licensees of their responsibilities under the [GCA]." *Franklin Gun Shop*, 2006 WL 2263992, at *7. Despite these warnings, Anzio's violated this same provision again in 2018. And it did so by manufacturing at a location that was not listed on its license, just as it had in 2012. Anzio's refusal to follow the regulation is evidence of willfulness. *See Borchardt Rifle Corp. v. Cook*, 684 F.3d 1037, 1043 (10th Cir. 2012) ("[A]fter a dealer has been informed of the Gun Control Act requirements and warned of violations, a dealer's subsequent repeat violations suffice to show plain indifference to the statutory requirements."); *Willingham Sports II*, 415 F.3d at 1277 (same).

Nor was the off-site manufacturing the only repeat violation. Despite the warnings in 2012 and Anzio's promise to fully comply in the future, (Doc. 25-11 at 3), Anzio broke the recordkeeping requirements of § 478.124(a) again in 2018, (Doc. 25-2 at 46). And that is not all. In 2012, ATF faulted Anzio for inadequately identifying the firearms it produced with serial numbers as required in 27 C.F.R. § 479.102. (Doc. 25-11 at 3.) In 2018, ATF cited Anzio again for failing to properly mark six firearms with a serial number, (Doc. 37-1 at 14), though this time ATF listed it under § 478.92, which contains substantially similar firearm-marking requirements as § 479.102. And yet, at the warning conference in

2012, Anzio had stated that it would "mark [its] firearms in a timely manner" and would "remain in compliance" with these firearms regulations. (Doc. 25-11 at 3.) That Anzio had been "audited and cited for the[se] same or similar violations" in 2012 further supports that Anzio deliberately disregarded or was plainly indifferent to the regulations limiting its operations to its listed premises. *Franklin Gun Shop*, 2006 WL 2263992, at *6; *see also Garner v. Lambert*, 345 F. App'x 66, 73 (6th Cir. 2009) ("[A]t some point, a series of purported mistakes may evince a tolerance for errors and thus a plain indifference to the applicable statutory and regulatory requirements.").

Anzio disagrees, arguing that the regulations are "complex" and "by nature difficult to understand," so that it reasonably believed that a responsible person could manufacture off-site so long as the other location was licensed. (Doc. 44 at 2, 16–17.) As explained above, the rules about activities outside the premises listed on the license are not difficult to understand. Nor are they particularly voluminous. The regulation Anzio violated is only 176 words. *See* § 478.50. The regulations clearly provide that a licensed entity is permitted to operate only at the address listed on its license. *See* § 478.41(b) (explaining that a separate license is required for "each place at which the applicant is to do business"). To be sure, there are exceptions. *See* § 478.50(a)–(d) (excluding activities at gun shows, storage at a separate warehouse, and weapons classified as "curios and relics"). But none of them mention a "responsible person" or allow for activities at another entity's premises. And

18

Anzio cites no basis for its purported belief. Nor does Anzio explain how it reconciled its belief with the regulations that the ATF brought to its attention in 2012.

Finally, Anzio argues that its 2017 report to ATF disclosed that it was manufacturing firearms at Ligamec and that it would not have done so if it knew it was unlawful. (Doc. 44 at 17.) But Anzio does not supply the 2017 report or cite a source that supports its contents. Instead, Anzio cites the firearms inspection record, which references the 2017 report and then describes what Remo said to the ATF investigators during the September 2018 inspection. (Doc. 37-1 at 13.) In other words, the inspection record—which refers to Remo throughout as "the licensee"—relates what Remo said contemporaneously to the agents, not what the 2017 report stated. (*Id.* at 12–13 (noting that the "licensee agreed" with the ATF agents and "stated that operations would immediately cease").)

But even if Anzio was correct that the 2017 report showed that it believed a responsible person could operate off-site if it was done at a licensed facility, Anzio knowingly violated even this watered-down rule. Ligamec held a Type 07 FFL, which means that it was not licensed to make destructive devices or silencers. Yet those were the items Anzio transferred for processing to Ligamec. So Ligamec was not a licensed location for that activity. Ruiz knew that Ligamec was not authorized to make these items. And the evidence shows that Remo knew too. Acting for Anzio, he had applied for both the Type

10 and Type 07 licenses. He also allowed the Type 07 license to lapse in 2017, while maintaining the Type 10 license, showing he knew which activities each license allowed. In short, even if Anzio believed it could operate from a licensed facility, it knew that Ligamec was not licensed for the work Ruiz did there.

In sum, Anzio's defense of confusion and ignorance "is an astonishing one given [its] long tenure as a federally licensed firearms [manufacturer]." *Nationwide Jewelry*, 455 F. Supp. 2d at 1385–86 (rejecting a similar argument). In the light of Anzio's extensive experience with firearms licensing, the clarity of the regulations, the prior violations, the warning conference, the follow-up letter, and the internal inconsistency of its proffered explanation, there is ample evidence that it knew of its obligations and deliberately disregarded or was plainly indifferent to them.

### 3.  Anzio's Receipt of a Warning Letter

A violation is more likely to be willful when the licensee has received a warning letter "advising it that repeated violations of the regulations could result in the revocation of its license." *Willingham Sports II*, 415 F.3d at 1277.

Anzio received just such a letter after its 2012 inspection. The June 5, 2012 letter listed the code sections Anzio had violated—including 27 C.F.R. § 478.50—thus providing Anzio the opportunity to review those sections. The letter also specified that Anzio had promised to "only operate from licensed premises" and "now understand[s] these

requirements fully and will remain in compliance with them." (Doc. 25-11 at 3.) And for questions that arose afterward, the letter invited Anzio to contact ATF if it had "any questions concerning [its] responsibilities as a licensee or if [it] require[d] further clarification regarding particular requirements of Federal firearms laws." (*Id.* at 4.) Finally, the letter warned Anzio that "future violations, repeat or otherwise, could be viewed as willful" and that it should "anticipate further inspections." (*Id.* at 3.)

Anzio's 2018 violations of the premises limitation show that it did not heed the 2012 letter's warning, take advantage of the option to ask questions, or pay attention to the cited regulations. Nor did Anzio keep its promise to "only operate from licensed premises." (*Id.* at 3.) At best, that is "a lack of concern for [GCA] regulations" that amounts to plain indifference. *Simpson v. Att'y Gen. United States*, 913 F.3d 110, 115 (3d Cir. 2019) (alteration in original) (quotation omitted); *see Nationwide Jewelry*, 455 F. Supp. 2d at 1385 (rejecting the contention that "violations [that] occurred after [the licensee holder] was formally warned that future violations would result in revocation" were mere mistakes rather than plain indifference). And it certainly supports a finding of more—that Anzio deliberately disregarded § 478.50. *See Wilborn*, 2014 WL 5502495, at *4 (reasoning that violations after a warning letter show willfulness); *accord Athens Pawn Shop Inc. v. Bennett*, 364 F. App'x 58, 60 (5th Cir. 2010) (per curiam). Either is sufficient to "show[] willfulness for purposes of [the GCA]." *Willingham Sports II*, 415 F.3d at 1277.

#### 4. The Knowledge of Anzio's Employees

Anzio, as a corporate entity, can only act through its employees. Under the GCA, Anzio acts through the responsible persons attached to its license and is thus accountable for them. *See Oconee Sporting Sales, Inc. v. Compton*, No. 309-cv-090, 2010 WL 11610613, at *6 (S.D. Ga. June 23, 2010); (Doc. 25-13 at 5). Accordingly, if one of its responsible persons willfully disregarded known legal requirements, so did Anzio. *See Oconee Sporting Sales*, 2010 WL 11610613, at *5–6 (explaining that a corporate FFL holder is liable for the knowledge and acts of its employees acting within the scope of their employment); *accord Fairmont Cash Mgmt., L.L.C. v. James*, 858 F.3d 356, 362–63 (5th Cir. 2017).

Here, Anzio is responsible for the acts of Remo and Ruiz. As explained above, there is ample evidence that Remo knew of the regulations restricting Anzio's operations to its licensed premises. Ruiz knew too. When ATF agents discussed Anzio's off-site manufacturing with Ruiz, he admitted that the arrangement was unlawful because Ligamec was not licensed to make these products. Nevertheless, Ruiz did it anyway. He took forty-five firearms for manufacturing and assembly to Ligamec. In sum, he deliberately disregarded known regulations in order to follow Remo's directions. Because Ruiz was a responsible person for Anzio and was acting for its benefit and as its agent when completing the manufacturing of Anzio's merchandize, that willful disregard is attributable to Anzio

in addition to Remo's, which was discussed at length above. *See Oconee Sporting Sales*, 2010 WL 11610613, at *6 & n.9 (holding a corporate licensee responsible for the knowledge of its agents).

## IV.   CONCLUSION

Under § 923(e), ATF may revoke an FFL for any willful violation of the statutory or regulatory rules for firearms licensee. There is no genuine issue of material fact that Anzio "knew of the regulations, had violated them in the past and been warned of the need for compliance, and then continued to violate the same regulations." *Borchardt Rifle Corp.*, 684 F.3d at 1044. This evidence shows Anzio was plainly indifferent to the premises limitation, despite its awareness of it. And Anzio proffers only an inconsistent defense as evidence that it did not act willfully, which is insufficient to avoid summary judgment. Thus, ATF was authorized to revoke Anzio's Type 10 FFL license and deny its application for a Type 07 license.

Accordingly, the following is **ORDERED:**

1.   Respondent's Motion for Summary Judgment (Doc. 37) is **GRANTED.** Petitioner's request for summary judgment (Doc. 44) is **DENIED.**

2.   The Clerk is directed to **TERMINATE** any pending motions and deadlines, **ENTER** judgment in favor of Respondent and against Petitioner, and **CLOSE** this case.

**ORDERED** in Tampa, Florida, on May 12, 2022.

Kathryn Kimball Mizelle
United States District Judge